UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jonathan Alexander Truong,

        Plaintiff,

v.

Ahmad Aladin Hassan, in his
individual capacity and the Metropolitan
Council, a public corporation,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-2947 ADM/TNL

_____

A.L. Brown, Esq., Capitol City Law Group, LLC, St. Paul, MN, on behalf of Plaintiff.

Jason M. Hiveley, Esq., Iverson Reuvers Condon, Bloomington, MN, on behalf of Defendants.
_____

## I. INTRODUCTION

This matter came before the undersigned United States District Judge on January 13, 2015 on Defendants' Motion for Summary Judgment [Docket No. 15].[1]  For the reasons discussed below, Defendants' Motion is granted.

## II. BACKGROUND

On October 7, 2007, Plaintiff Jonathan Truong ("Truong") attempted to board a Metro Transit bus at 11:53 p.m.  Brown Aff., [Docket No. 22] Attach. 1, Metro Transit Bus Video ("Video").  The bus was driven by Defendant Ahmad Aladin Hassan ("Hassan").  Truong, a native of Vietnam, grew up during the Vietnam war.  Hiveley Aff., [Docket No. 17] Ex. 1 ("Truong Dep.") 6:6-13.  At the age of 20, Truong came to the United States and shortly

---

[1] The Court delayed the issuance of this Order to allow the parties to participate in a mediated settlement conference on April 29, 2015. No settlement was reached.

thereafter was diagnosed with post-traumatic stress disorder, obsessive-compulsive disorder ("OCD"), and a sleeping disorder. Id. Hassan has worked as a bus driver for Metro Transit for nearly eight years.[2] Hiveley Aff., Ex. 2 ("Hassan Dep.") 6:2. Truong was a frequent rider on Hassan's routes. Hassan Dep. 16:7. Truong claims he had a monthly bus pass, while Hassan believed Truong would often try to ride the bus without paying. Video 11:53:29; Truong Dep. 14:4-10.

On the night of this videotaped incident, Truong attempted to ride a bus driven by Hassan. Before Truong boarded the bus, Hassan said "[d]on't get on my bus." Video 11:53:18. According to Hassan, Truong rode his bus earlier that day and did not pay the $1.50 fare. Id. at 11:53:29. Hassan tried to close the doors before Truong could enter the bus, but Truong put his hands in the door and said "I am going to pay." Id. at 11:54:28. Once on the bus, Truong repeated that he was going to pay. Id. 11:53:45.

Truong shuffled through a plastic bag he was carrying. Truong's OCD leads him to constantly wipe his hands, which is why he claims it was taking him awhile to get his bus pass out of the bag. Truong Dep. 18:13-24. Hassan, growing impatient, repeated "[g]et off my bus." Video 11:54:30. After Truong had been on the bus for about one minute without paying, Hassan stood up, grabbed Truong's plastic bag and threw it off of the bus. Id. at 11:54:50. Trong asked, "are you going to call the police?" Id. at 11:55:00. Hassan then physically grabbed Truong by the shoulders, pushed him out the door and extended his foot in a kicking motion. Id. Truong "believe[s] there was a force on [my back.]" Truong Dep. 50:14. Hassan testified that he kicked

---

[2] The Metropolitan Council operates Metro Transit. See About Us, Metropolitan Council, http://www.metrocouncil.org/About-Us/The-Council-Who-We-Are.aspx (last visited May 6, 2015).

toward Truong, but that this foot did not make contact with Truong's body.  Hassan Dep. 10:24.  While removing Truong from the bus, Hassan said "[i]f I say get off the bus, you get off the bus."  Video 11:54:54.

Once off the bus, Truong tried to hold the bus door open.  Id. at 11:55:12.  Hassan can be heard saying "[h]e does this every fucking day," "have a good day sir," and "this guy is a nutcase man."  Id. at 11:55:59.  Although not shown in the video, Truong states that he then held onto the front of the bus.  See Truong Dep. 37-41 ("I want to hang onto the bus to show him that he cannot drive the bus when a passenger is still hanging on the bus . . I have to . . . grab on the front by the windshield wiper and stand on the bumper around the corner of the [headlight], and hanging there, and then I showed my face at the windshield, to let him know that I'm not on the street, away from his view, but I'm right up here on his windshield.").

Over the next two minutes, Hassan accelerated and braked the bus suddenly at least three times.  Video 11:58:01.  Hassan claims that Truong was not affixed to the bus, but rather would jump in front of the bus when it started moving.  Hassan Dep. 22:18; 23-25.  The video does not capture a view of the front of the bus, but Hassan can be heard saying "[s]omebody get this guy off of here man," "[i]s he back on?" and "I've got to get this guy off."  Video 11:59:56; 12:00:54; 12:01:00.  Truong claims that Hassan drove very close to the curb in an attempt to use trees and street signs to brush him off of the bus.  Truong Dep. 46:19-25.

The video also shows a group of young male passengers on the bus who laugh throughout the incident.  Video 11:58:01.  They asked Hassan if they could get off and "whoop [Truong's] ass."  Id. at 11:58:19.  Hassan told them not to hurt Truong, but that "it would be great if they could get him off of the bus."  Id. at 11:58:21.  Hassan opened the back door and several men got

3

off and returned about 20 seconds later. Id. at 11:58:40. Hassan accelerated and braked hard again. Id. The video shows that those standing on the bus were thrown off balance and had to catch themselves. Id. at 11:59:38. Hassan said "somebody get this guy off of here man, I've had it with this fucking guy." Id. 11:59:59. Several passengers again exit the bus. Id. A few seconds later, Hassan told those passengers to get back on the bus because he "has to go." Id. 12:00:48. Hassan accelerated and abruptly stopped the bus again. Id. 12:00:55.

Police who were nearby noticed the incident and came to investigate. Id. 12:01:07. The officers asked Hassan some questions about the incident while he was seated in the driver's seat. Id. At one point, Hassan stated "I don't think [Truong] is alright in the head." Id. 12:05:38.

Truong testified that when Hassan physically removed him from the bus he was "terrified" and had a "numbing feeling" throughout his body. Truong Dep. 32:20-33:4. Truong claims that the passengers who got off the bus pulled him from the bus, threw him on the pavement and punched him. Id. at 55-56. Truong suffered minor physical injuries as a result of the incident, including a bruised thigh, bruised cheek, and bloody scrapes on both hands. Id. at 62: 21-23. He was taken to a hospital where he was examined by a doctor, given pain relief medication, had his hands bandaged, and was administered a tetanus shot. Id. 63–65.

Truong filed this suit on October 27, 2013, alleging four claims: (1) a Section 1983 claim for excessive force under the Fourth Amendment; (2) a Section 1983 claim for substantive due process under the Fifth and Fourteenth Amendments; (3) negligence; and (4) vicarious liability against the Metropolitan Council. Compl. [Docket No. 1] ¶¶ 39-63.

## III.  DISCUSSION

### A.  Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure states a court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  "While a party moving for summary judgment has the burden of showing that there is no genuine issue of fact for trial, a nonmoving party seeking to avoid having summary judgment entered against it may not rest on mere allegations or denials, but must set forth specific facts sufficient to raise a genuine material issue for trial."  Thomas v. Runyon, 108 F.3d 957, 959 (8th Cir. 1997).

A fact dispute is "material," and will thus preclude summary judgment, only if the dispute "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  And where the moving party has carried its burden, the nonmoving party must then "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The "very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Fed. R. Civ. P. 56(e) advisory committee's note to 1963 Amendment.

### B.  Qualified Immunity

Hassan argues that he is protected by qualified immunity on Truong's constitutional claims.  The doctrine of qualified immunity protects government actors from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)

(citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The "driving force" behind the creation of the doctrine was to eliminate insubstantial claims against government officials prior to discovery. Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987).

Two questions are considered to determine whether officials are protected by qualified immunity: (1) whether the facts alleged, viewed in the plaintiff's favor, support a finding that the conduct of the defendants violated a constitutional right; and (2) whether that constitutional right was "clearly established" at the time of the incident such that a reasonable officer would have known that his or her actions were unlawful. Pearson, 555 U.S. at 232. The order in which the qualified immunity prongs are addressed is left to the court's discretion. Id. at. 236. "Qualified immunity is appropriate only if no reasonable fact-finder could answer yes to both of these questions." Nelson v. Corr. Med. Servs., 583 F.3d 522, 528 (8th Cir. 2009).

**1. Truong's Excessive Force Claim**

Truong asserts a claim of excessive force under the Fourth Amendment. Defendants argue that this claim should be dismissed because in this context, Truong's excessive force claim should be evaluated under the Fourteenth Amendment's Due Process Clause. Truong agrees, stating "Plaintiff's claim, as the defendants have requested, should be analyzed under the Fourteenth Amendment standard." Pl.'s Am. Opp'n Mem. [Docket No. 21] 4.

Claims of excessive force that do not involve an arrest or seizure by law enforcement are properly analyzed under the Due Process Clause of the Fourteenth Amendment. Hall v. Ramsey County, Civ. No. 12-1915, 2014 WL 4055368, at *5 (D. Minn. Aug. 14, 2014) (citing Lanman v. Hinson, 529 F.3d 673, 680-81 (6th Cir. 2008) ("[W]hen a plaintiff is not in a situation where his rights are governed by the particular provisions of the Fourth or Eighth Amendments, the more

generally applicable Due Process Clause of the Fourteenth Amendment provides the individual with protection against physical abuse by officials.") (citation omitted)); see also Hemphill v. Schott, 141 F.3d 412, 418 (2nd Cir. 1998). Accordingly, Truong's excessive force claim pursuant to the Fourth Amendment is dismissed.

### 2. Truong's Substantive Due Process Claim

Count Two of Truong's Complaint pleads a violation of substantive due process and Truong's excessive force claim correctly proceeds under a Fourteenth Amendment analysis.[3] The Fourteenth Amendment states that "no state shall . . . deprive any person of life, liberty or property, without the due process of law . . . ." U.S. Const. amdt. XIV § 1. The United States Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government.'" Cnty. of Sacramento v. Lewis, 523 U.S. 833, 844 (1998) (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)). An executive official violates substantive due process when his or her conduct is "conscience shocking *and* . . . violate[s] one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Terrell v. Larson, 396 F.3d 975, 978 n.1 (8th Cir. 2005) (emphasis in original) (internal quotation and citation omitted).[4]

This conscience shocking standard remains the yardstick under which the Court evaluates

---

[3] The second count of Truong's Complaint generally alleges a "Violation of Civil Rights–Substantive Due Process." Although not specified in the Complaint, the Court assumes that Truong is asserting an excessive force substantive due process claim. As noted above, the parties agree that the excessive force claim should properly proceed under a Fourteenth Amendment substantive due process analysis.

[4] The second "fundamental right" requirement is not at issue in this case.

substantive due process claims. Lewis, 523 U.S. at 846 ("[F]or half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience."). However, courts have applied varying measures to determine if conduct rises to the threshold of "conscience shocking" for differing factual scenarios. Specifically, courts have utilized two standards for measuring such behavior: (1) the intent-to-harm standard and (2) the deliberate indifferent standard. See Terrell, 396 F.3d at 978. As stated by the Eighth Circuit:

> Because a wide variety of official conduct may cause injury, a court must first determine the level of culpability the § 1983 plaintiff must prove to establish that the defendant's conduct may be conscience shocking. Mere negligence is never sufficient. Proof of intent to harm is usually required, but in some cases, proof of deliberate indifference, an intermediate level of culpability, will satisfy this substantive due process threshold. Lewis, 523 U.S. at 848-49. The deliberate indifference standard "is sensibly employed only when actual deliberation is practical." Id. at 851; see Wilson v. Lawrence County, 260 F.3d 946, 957 (8th Cir. 2001). By contrast, the intent-to-harm standard most clearly applies "in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation." Neal v. St. Louis Cnty. Bd. of Police Comm'rs, 217 F.3d 955, 958 (8th Cir. 2000).

Id. "Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury." Sitzes v. City of W. Memphis Ark., 606 F.3d 461, 467 (8th Cir. 2010) (citing Terrell, 396 F.3d at 981); see also Armstrong v. Squadrito, 152 F.3d 564, 581 (7th Cir. 1998) (holding that the "shocks the conscience" analysis is a question of law).

### i. Conscience Shocking Standard

The Court must first determine if a deliberate indifference or intent-to-harm conscience shocking standard applies to this case. The parties dispute the governing standard, as they disagree whether the circumstances of this case were "rapidly evolving" or allowed for "actual

8

deliberation." Compare Pl.'s Jan. 26, 2015 Letter [Docket No. 27] with Defs.' Feb. 3, 2015 Letter [Docket No. 28].

The authority cited by the parties present very different factual circumstances. Hassan cites Terrell for his position that this case meets the very definition of "rapidly evolving." 396 F.3d 975 (8th Cir. 2005). In Terrell, the Eighth Circuit evaluated a substantive due process claim related to a high speed chase by law enforcement that resulted in an innocent citizen's death. See generally id. The court concluded that the "intent-to-harm standard of Lewis applies to an officer's decision to engage in high-speed driving in response to other types of emergencies, and to the manner in which the police car is then driven in proceeding to the scene of the emergency." Id. at 978. In contrast, Truong cites Scott v. Baldwin, 720 F.3d 1034, 1036 (8th Cir. 2013), where the Eighth Circuit held that deliberate indifference was the appropriate standard to be applied to the question of whether a correctional officer's delay in abiding by a Court order to recalculate inmates' sentences constituted a violation of the inmates' substantive due process rights. The Scott court concluded that the deliberate indifference standard was applicable because "actual deliberation [of the correctional officer was] practical" on the part of the correctional officer. Scott, 720 F.3d at 1036.

The parties' disagreement of which standard to apply in this case is understandable, as neither Terrell nor Scott present facts very similar to the instant case. Hassan did not have the benefit of several days to reflect on how to best manage the situation with Truong, but he also was not directly responding to a true emergency situation such as officers face in a high speed chase.

The Court's analysis of the present case leads to the conclusion that the intent to harm

9

standard is most appropriately applied here for several reasons. First, the situation was "rapidly evolving" and "fluid." Although the encounter between Hassan and Truong spanned approximately ten minutes, the situation escalated quickly. Within seconds of being forced from the bus, Truong attempted to hold the bus door open. Within minutes, Truong was trying to grab hold of the front of the bus, preventing Hassan from continuing along his time-sensitive route. After Truong attempted to attach himself to the front exterior of the bus, Hassan no longer was able to engage in "actual deliberation" and instead was reacting to a rapidly evolving and fluid situation.

Second, Hassan was also managing a dangerous situation—that is, as the situation escalated there was an increased chance that someone could get hurt. During his deposition, Truong admitted that he intentionally attempted to prevent the bus from leaving. After being removed from the bus, Truong repeatedly pushed his foot into the bus door to prevent the doors from closing. Shortly thereafter, Truong jumped up onto the bus and grabbed hold of a side mirror to achieve a tight grip on the bus —"when I feel the bus on the move, I try to hang on the bus. If I cannot, if I cannot prevent the door from shutting, I want to hang onto the bus to show him that he cannot drive the bus when a passenger is still hanging on the bus." Truong Dep. at 37:15-20. A passenger intentionally preventing a bus from departing through physical obstruction unquestionably qualifies as a dangerous situation.

Finally, Hassan was responding to a scenario of competing public obligations. See Porter v. Osborn, 546 F.3d 1131, 1139 (9th Cir. 2008) (stating that the intent-to-harm standard applies to situations which occur "over a short period necessitating 'fast action' and presenting 'obligations that tend to tug against each other'" (quoting Lewis, 523 U.S. at 853)). Hassan was

expected to ensure the safety of his passengers, but he was also expected to confirm that passengers paid the appropriate fare while also keeping his bus on schedule. These competing obligations are similar to obligations faced by police officers in emergency situations where the intent-to-harm standard is applicable. See Lewis 523 U.S. at 853 ("Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance." (quotation omitted)).

For these reasons, the intent-to-harm standard is most appropriate to apply here and will guide the Court's analysis in deciding whether or not Hassan's actions shocked the conscience.

### ii. Application of the Intent-to-Harm Standard

Hassan argues that he is entitled to summary judgment because there is no evidence he acted with an intent to harm Truong. The Court agrees. In Helseth v. Burch, the Eighth Circuit, evaluating a high speed police chase which resulted in injury and the death of an innocent bystander, concluded that "only a purpose to cause harm *unrelated to the legitimate object of arrest* will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." 258 F.3d 867, 872 (8th Cir. 2001) (emphasis in original) (quoting Lewis, 523 U.S. at 836). Here, Hassan had governmental authority to remove Truong from the bus. Minn. Stat. § 609.06 authorizes a reasonable use of force in situations "when used by a common carrier in expelling a passenger who refuses to obey a lawful requirement for the conduct of passengers and reasonable care is exercised with regard to the passenger's personal safety."

Taking the facts in a light most favorable to Truong, even if Hassan drove the bus close

to the curb and abruptly started and stopped the bus with Truong still grasping on, no evidence suggests that Hassan overtly intended to cause Truong injury. Rather, Hassan's statements and actions reveal that his primary concern was getting Truong away from the bus to allow him to continue his scheduled route. Hassan explicitly warned the passengers who left the bus in an attempt to remove Truong to not harm him and instead to "get him off there." Video 11:58:21. A few minutes later Hassan again states "I've got to get this guy off." Id. at 12:01:00. Although Hassan's actions to accomplish removing Truong from the bus may have been questionable, nothing in the record shows that Hassan intended to injure Truong. As a result, Hassan's behavior was not conscious shocking and he did not violate Truong's substantive due process rights.[5]

Because Hassan's actions did not constitute a constitutional violation, the Court need not address whether the constitutional right in question was "clearly established" at the time of the incident. See Abdouch v. Burger, 426 F.3d 982, 987 (8th Cir. 2005) (finding that it was unnecessary to reach the second stop of the qualified immunity analysis when "we concluded that the defendants' conduct, viewed in a light most favorable to the plaintiff, did not violate a constitutional right"). Hassan is entitled to summary judgment on Truong's substantive due process claim and the claim is therefore dismissed.

---

[5] Although finding that Hassan's behavior was not so conscious shocking so as to support a substantive due process violation, the Court has serious concerns about Hassan's management of the situation. Hassan's apparent willingness to allow a group of passengers to remove Truong from the front of the bus is not an encouraged course of action.

**C. State Law Claims**

Truong additionally asserts a state law claim of negligence against Hassan and a vicarious liability claim directed at the Metropolitan Council. Defendants argue that both claims fail on the merits and they are therefore entitled to summary judgment. Truong failed to respond to Defendants' arguments in his responsive memorandum. See generally Pl.'s Am. Opp'n Mem. Thus, the Court considers these claims abandoned. See Huttner v. Aurora Loan Servs., Civ. No. 11–1048, 2011 WL 2910390, at *1 (D. Minn. July 19, 2011) (dismissing as abandoned two claims with prejudice when plaintiff failed to respond to defendant's arguments); Trnka v. Biotel, Inc., Civ No. 07-1206, 2008 WL 108995, at *3 n.4 (D. Minn. Jan. 9, 2008) (finding a claim abandoned because plaintiff failed to respond to defendant's summary judgment arguments regarding the claim in her opposition brief). However, even if this Court were to find that Truong's negligence and vicarious liability claims were not abandoned, such claims fail on the merits and therefore dismissal of these remaining claims is appropriate.

**1. Negligence**

A negligence claim under Minnesota law contains four elements: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach of the duty being the proximate cause of the injury. Engler v. Ill. Farmers Ins. Co., 706 N.W.2d 764, 767 (Minn. 2005). However, Truong's claim fails because, as a public official, Hassan is entitled to official immunity. See Dokman v. Cnty. of Hennepin, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (citing Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990)).

In evaluating whether official immunity is applicable, the Court engages in a two-step analysis: (1) whether the acts at issue are discretionary or ministerial; and (2) whether the acts

were malicious or willful and thus not entitled to immunity. Dokman, 637 N.W.2d at 296 (citing Davis v. Hennepin Cnty., 559 N.W.2d 117, 122 (Minn. Ct. App. 1997)).

As to the first factor, Hassan engaged in discretionary decision making during his encounter with Truong. Official immunity under Minnesota law protects discretionary decision making, but does not protect the exclusively "ministerial duties" of a public official. Id. "A discretionary act is one for which an official must exercise judgment or discretion. A ministerial act involves merely the execution of a specific, absolute duty." Id. (internal quotation and citations omitted). Here, Hassan faced a rapidly evolving situation during which he exercised his discretion regarding how best to manage Truong's irrational behavior. Hassan's actions cannot be considered as "merely the execution of a specific, absolute duty." Rather, he had to evaluate how to handle a situation with a disturbed passenger that was escalating at a fast pace and was potentially dangerous.

The Court next evaluates whether Hassan's actions were malicious or willful. Malice means "nothing more than the intentional doing of a wrongful act without legal justification, excuse, or, otherwise stated, the willful violation of a known right." Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991) (quotation and citation omitted). In other words, a public official commits a willful or malicious wrong by "intentionally committ[ing] an act that he or she then has reason to believe is prohibited." Id. The video recording clearly reflects Hassan was highly frustrated with the situation. However, nothing within the record indicates that Hassan acted in a malicious manner or with bad faith. See Reuter v. City of New Hope, 449 N.W.2d 745, 751 (Minn. Ct. App. 1990) (stating that a plaintiff may not rely solely on "bare allegations of malice" but rather must "present specific facts evidencing bad faith"). As noted above, Minnesota law

allows for the reasonable use of force "when used by a common carrier in expelling a passenger who refuses to obey a lawful requirement for the conduct of passengers and reasonable care is exercised with regard to the passenger's personal safety." Minn. Stat. § 609.06. Thus, to the extent Hassan engaged in physical and forceful behavior toward Truong, Minnesota law provides a "legal justification" and Hassan had no reason to believe his actions were wrong. Because Hassan was engaged in discretionary decision making at the time of the incident and the Court concludes that no reasonable jury could find that his actions were malicious or willful, Defendants are entitled to summary judgment on Truong's state law negligence claim.

### 2. Vicarious Liability

Finally, Truong brings a vicarious liability claim against the Metropolitan Council.[6] However, having found that Hassan is entitled to official immunity, this immunity should also be extended to the Metropolitan Council.

The Minnesota Supreme Court has stated that "[g]enerally, if a public official is found to be immune from suit on a particular issue, his or her government employer will be vicariously immune from a suit arising from the employee's conduct and claims against the employer are dismissed without explanation." Anderson v. Anoka Hennepin Indep. School Dist. 11, 678 N.W.2d 651, 663–64 (Minn. 2004). Despite this, vicarious liability of the employer continues to be a policy question. Id. at 664. Specifically, the Minnesota Supreme Court extends vicarious official immunity to employers when:

---

[6] In their Memorandum in Support of Summary Judgment, Defendants argue that if Truong is asserting a vicarious liability claim related to the § 1983 excessive force claim under Monell v. Dep't of Soc. Servs, 436 U.S. 658, 694 (1978), the claim fails. Truong makes clear in his response brief that he is not asserting a Monell claim.

> failure to grant it would focus stifling attention on an official's performance to the serious detriment of that performance. This standard grants vicarious official immunity in situations where officials' performance would be hindered as a result of the officials second-guessing themselves when making decisions, in anticipation that their government employer would also sustain liability as a result of their actions.

Id. (quotation and citation omitted). Here, the policy considerations dictate that Metropolitan Council be entitled to vicarious official immunity. Policy does not support a conclusion that would have bus drivers reluctant to manage dangerous situations with noncompliant passengers out of fear of Metropolitan Council's liability. Because Hassan is entitled to official immunity from the negligence claim and in compliance with the general rule, the Metropolitan Council is entitled to vicarious official immunity. Truong's vicarious liability claim is therefore dismissed.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 15] is **GRANTED** and Truong's Complaint is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:

　　　s/Ann D. Montgomery　　　
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 14, 2015.